IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| WAYMAN L. GULLEY, JR., | ) | Case No. 10 C 50216 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Hon. P. Michael Mahoney |
| v. | ) | U.S. Magistrate Judge |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.      Introduction**

Wayman L. Gulley ("Gulley") seeks judicial review of the Social Security

Administration Commissioner's decision to deny his claim for Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act, and Supplemental Security Income ("SSI")

benefits, under Title XVI of the Social Security Act. *See* 42 U.S.C. § 405(g). This matter is

before the Magistrate Judge pursuant to the consent of both parties, filed on February 24, 2011.

*See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

**II.      Administrative Proceedings**

Gulley applied for DIB and SSI on December 27, 2005, declaring that he was disabled as

of May 20, 2005 due to scoliosis, miscellaneous back problems, sickle-cell trait, diabetes, and

blindness in his right eye. (Tr. 65, 121.) This initial application was denied on March 22, 2006,

and Gulley's application was denied a second time, upon a request for reconsideration, on May

1

18, 2006. (Tr. 65, 104.) Gulley then filed a timely request for a hearing before an Administrative Law Judge ("ALJ") on July 10, 2006. (Tr. 29, 122.) The hearing took place before ALJ Cynthia M. Bretthauer on March 22, 2007 via video teleconference between Evanston and Rockford, Illinois. (Tr. 29, 31.) Gulley appeared and testified in Rockford with a non-attorney representative present. (Tr.322, 324-325.) Vocational expert ("VE"), Frank Mendrick, also testified before the ALJ. (Tr. 31, 59.)

On April 18, 2007, the ALJ found Gulley was not disabled, and therefore denied his claims for DIB and SSI. (Tr.80.) In response, Gulley filed a Request for Review with the Social Security Administration's Office of Hearing and Appeals. (Tr. 148.) The Appeals Council remanded the case for another hearing, finding that the ALJ did not "provide adequate rationale for . . . rejecting the treating source opinion [that Gulley was disabled]" and must, "if necessary, obtain evidence from a medical expert to clarify the nature and severity of [Gulley's] impairments." (Tr. 81-84.)

The second hearing took place on July 8, 2008. (Tr. 7.) This time around, Gulley appeared in person at Evanston with his representative, and VE, William Schweihs, testified during the hearing; yet, the ALJ declined to call a medical expert to testify. (Tr. 8, 23.) The ALJ again determined that Gulley was not eligible for benefits. (Tr. 89-103.) Gulley filed another request for review with the Appeals Council, and on July 16, 2010, the request was denied. (Tr. 1-5.) Therefore, the ALJ's decision is considered the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 404.981, 416.1455, 416.1481. Gulley now files a complaint in this Federal District Court, seeking judicial review under 42 U.S.C. §§ 405(g), 1383(c)(3).

### III.   **Background**

Gulley was forty-four years old when he appeared at the second ALJ hearing. (Tr. 7, 65.) He was approximately five-feet tall and weighed approximately 162 pounds at the time of his initial application. (Tr. 244.) As of the second hearing, Gulley maintained sole custody of his five-year old daughter and lived with her in a public-housing apartment in Rockford, Illinois. (Tr. 11.) He has a high school diploma and can read and write. (Tr. 35.)

According to his testimony, Gulley's typical day begins with him taking his medications and feeding his daughter. (Tr. 17.) His daughter can usually dress and bathe herself, but sometimes he needs to help. (Tr. 17, 18.) He is able to do household chores and clean his home, but he must break the task up over a few days; he claims it often takes two-to-three weeks to clean his entire house. (Tr. 23, 48.) His daughter will help him with a few basic activities, such as putting on his socks, and getting him snacks to control his blood sugar. (Tr. 21-22.)

Gulley relies on public transportation, family, and friends to run errands. (Tr. 35.) He stated that he had a current driver's license, but he is not "comfortable" driving because of his blindness. (Tr. 34.) He testified that he is able to walk for approximately four blocks and can stand and sit still for about fifteen minutes at a time, but he often relies on a cane for ambulation. (Tr. 16, 46.)

From 1988 to 2004, Gulley was employed as a film technician for a local newspaper. (Tr. 255.) His job consisted mainly of scanning images and "making plates for the pressmen." (Tr. 36.) He was ultimately let go from his job without being given a specific reason, but Gulley believes that it was due to the fact he missed "a lot of work" due to illness. (Tr. 36.) Although he lists 2005 as a disability onset date, Gulley stated that he has tried to work, despite his alleged disability, as recently as 2006. (Tr. 36.) During this time, he was employed to some extent by

Life Touch Publishing, a yearbook publisher. (Tr. 36.) Gulley claimed that he was unable to return to work because his health issues. (Tr. 36.)

Requesting judicial review, Gulley maintains that he is unable to work due to back and shoulder pain, failing eyesight, colitis, and other complications from uncontrolled diabetes. (Tr. 13-15.) He testified that his back and shoulder give him the most pain; he describes a stabbing and burning sensation running the length of his spine and into his right shoulder. (Tr. 13-15.) He is unable to sleep at night because of the pain. (Tr. 13-14.) Gulley is also blind in his right eye, experiences intermittent bouts of constipation and diarrhea that he claims preclude him from work as they affect his ability to concentrate on work. (Tr. 36-37, 13-15.)

## IV.    **Medical Evidence**

### A.    **Back and Shoulder Pain**

On January 13, 2002, Gulley was involved in an automobile accident and "sustained severe blunt . . . trauma to the right of his chest." (Tr. 336.) He suffered multiple broken ribs and pulmonary contusions, but denied any numbness, tingling, or neck and back pain at the time. (Tr. 340.) He was discharged from Swedish American Hospital ten days later, on January 23. (Tr. 337.)

Later that year, Gulley saw Genaro A. Jimenez, physical therapist, at Swedish American Ambulatory Rehab Therapy Services ("ARTS") on March 26, 2002, reporting right-shoulder pain. (Tr. 353.) Gulley stated that he was unable to accomplish basic activities, such as washing his hair, bowling, or getting up off of the floor. (Tr. 353.) Following an evaluation, Jimenez found that all range of motion was painful in the right shoulder. (Tr. 353.) On a pain-scale of one to ten ("ten" being the most extreme pain), Gulley described the pain as an "eight," but only when in motion. (Tr. 355.) Jimenez attributed the pain to muscular strain and prescribed two

weeks of stretching exercises, therapy, and the application of moist heat to the shoulder. (Tr. 355-356.)

On April 16, 2002 he returned to ARTS. (Tr. 351.) It was reported that he completed all scheduled therapy sessions and that he "demonstrated restoration of normal strength and range of motion in the right shoulder. Patient has returned to work and had no report of exacerbation of right shoulder pain." (Tr. 351.) Gulley stated that he was one-hundred percent better following treatment and exercise. (Tr. 351.)

Three years later, on February 9, 2005, Gulley reported to the emergency room with neck pain. (Tr. 360.) He told the treating physician that the pain began in his lower right scalp and radiated down to his shoulder. (Tr. 360.) The pain was aggravated with motion. (Tr. 360.) Gulley stated that he must have "tweeked" his neck while wrestling with his daughter a few days prior. (Tr. 360.) He also claimed to be a weight-lifter, and that the activity worsened the pain. (Tr. 360.) Gulley described the pain as a "ten" on a scale of one-to-ten, but the doctor noted that "[Gulley] is sitting relaxed, [and] smiles. [He] [i]nteracts with me without difficulty." (Tr. 360.)

In early January of 2006, Gulley again experienced a fall outside while holding his young daughter. (Tr. 490.) After the fall, Gulley reported pain along his left side along the thoracic vertebrae. (Tr. 490.) On January 10, X-rays showed "severe" scoliosis and "[m]ulti[-]level spondylosis is demonstrated, most prominently within the mid to lower thoracic interspaces." (Tr. 490, 495.) Gulley continued to experience sharp back pain for several months, as Dr. Rose M. Stocker, D.O., kept him on his pain medications and attempted to persuade Gulley to undergo an MRI. (Tr. 436, 446, 469.)

Sometime around March 2, 2006, he attempted to pick an object off of the floor and his pain was aggravated. (Tr. 455.) He told doctors that the pain was so severe that he broke out in

sweat. (Tr. 455.) He could not straighten back up when he tied his shoes and he was unable to sit for more than fifteen minutes at a time. (Tr. 455.) Gulley finally completed an MRI on March 22, 2006. (Tr. 593.) The results revealed facet arthrosis due to scattered disc desiccation, and "[v]ery slight," "minimal," or "mild" bulges at L3-4, L4-5, and L5-1. (Tr. 593, 595.) "There is also mild to moderate lateral recess encroachment at [L]3-4." (Tr. 593.)

Almost eight months later, pain specialist, Dr. John Jaworowicz, M.D., evaluated Gulley on December 8, 2006. (Tr. 603.) Dr. Jaworowicz noted that Gulley indeed had facet arthritis and was scheduled for "L4-5 facet joint [cortisone] injections" later that day. (Tr. 603.) Dr. Jaworowicz then referred Gulley to Swedish American Outpatient Therapy Services. (Tr. 598, 603.)

At the initial therapy evaluation, Gulley complained of extreme pain his lower back and right shoulder. (Tr. 598.) Gulley reported that the recent cortisone injection failed to give him relief. (Tr. 598.) Undeterred, the physical therapist recommended a treatment plan involving six weeks of "therapeutic exercises" that Gulley could perform on his own, specifically consisting of "a home exercise program, body mechanics instruction, manual therapy, . . . aquatherapy, . . . kinesiotaping, electrical stimulation, ultrasound, moist heat[,] and lumbar traction." (Tr. 600.)

On January 11, 2007, Gulley returned to Dr. Jaworowicz for a follow-up. (Tr. 605.) He reported that his symptoms worsened. (Tr. 605.) Dr. Jaworowicz opined that "[Gulley's] options at this point were [to] either live with [the pain], continue some different pain medications[,] . . . or consider a facet rhizotomy." (Tr. 605.) Gulley stated that he would consider a rhizotomy "once he gets his diabetes and reflux under better control." (Tr. 605.) A few days later, on January 30, 2007, he was discharged from physical therapy. (Tr. 609.) It was reported that

Gulley cancelled his therapy after attending only two sessions, including his initial evaluation. (Tr. 609.)

**B.    Diabetes**

Being perhaps his most prevalent medical issue, the medical record is rife with references to Gulley's oft uncontrolled type-II diabetes. (Tr. 336-661.) He first suspected that he might have diabetes as early as 2001, before his car accident, as both of his parents had been diagnosed. (Tr. 338, 347.) An examination on January 14, 2002 revealed "[e]vidence of diabetes mellitus with elevated blood sugars and a history of polyuria and polydipsia." (Tr. 343.) As of 2005, Gulley was prescribed Glyburide, Metformin HCL, and Actos to help control his blood-sugar levels. Occasionally he would have trouble complying with his diabetes medications and treatments because of his alleged inability to pay for the medication. (Tr. 362, 405.)

Aside from the chronic blood-sugar fluctuations, the greatest impact that Gulley's diabetes has had on his ability to work is the detrimental effect it has had on his eyesight. (Tr. 390.) In December 2005, a treating physician reported that

> [Gulley] really does want to take care of his diabetes . . . . We discussed . . . the importance of [treating] diabetes and keeping it under control in light of blindness, heart attacks[,] and strokes. As a matter of fact, he is complaining of blurred vision in the right eye. . . . He has had visual changes in the right eye[.] [When] he closes his eye[,] there is a blackening out area.
>
> (Tr. 405.)

**C.    Retinal Occlusion**

The previous year, in February of 2004, Gulley was referred to Rockford Retina Clinic ("RRC") for a retinal consultation after he injured his head after slipping on a patch of ice. (Tr. 362, 376.) Ophthalmologist, Dr. Sina Bahmanyar, M.D., found significant macular edema, chorioretinal scarring, and peripheral sclerotic retinal vessels in Gulley's right eye; and lattice degeneration in both eyes. (Tr. 376.) Dr. Bahmanyar also noted possible hemoglobinopathy, or sickle cell disease; and "clinical non[-]proliferative diabetic retinopathy noted in both eyes." (Tr. 376.) Gulley was to contact RRC with any sudden changes in his vision, and soon afterwards, Gulley found himself undergoing a focal laser procedure on March 9, 2004. (Tr. 372, 377.) Unfortunately, the record is unclear as to the purposes or consequences of that treatment. He was diagnosed with central retinal vein occlusion, secondary to poorly controlled diabetes, with "severe loss of vision [in his] right eye" on December 15, 2005. (Tr. 390, 414, 562.) By April of 2006, doctors regularly reported that Gulley was blind in his right eye. (Tr. 318.)

### D.    Colitis

On January 20, 2006, Gulley reported that he noticed blood in his stool and was concerned that he might have colon cancer. (Tr. 306.) He was also suffering from bouts of diarrhea and constipation, sometimes going without a bowel movement for two or three days. (Tr. 425.) These problems persisted throughout the rest of that winter and spring. (Tr. 425, 455.) In April, Dr. Stocker noted that sometimes Gulley would only "pass blood." (Tr. 425.) It was recommended that Gulley be scheduled for a colonoscopy shortly thereafter. (Tr. 428.)

After a gastroenterology consultation, Gulley underwent a colonoscopy on May 24, 2006. (Tr. 425, 435, 527.) Pathologist, Susan T. Williams, M.D., examined the biopsies taken during the colonoscopy. (Tr. 528.) The biopsies revealed potential idiopathic inflammatory bowel

disease and ulcerative colitis. (Tr. 527.) Almost a year later, on May 14, 2007, Dr. Stocker issued a letter stating that Gulley was also "recently diagnosed with erosive duodenitis, which has caused chronic abdominal pain," although it is otherwise unclear from the court's review of the medical record when this diagnosis was initially made. (Tr. 612.) Regardless, Gulley's problems with rectal bleeding, diarrhea, and constipation burdened him throughout 2007 and 2008. (Tr. 574-576, 642.)

### E.    Medical Residual Functional Capacity Findings

Non-treating physician, Dr. George Andrews completed a "Physical Residual Functional Capacity Assessment" Form ("the form") on March 21, 2006. (Tr. 515-522.) Specifically, he found that Gulley could occasionally lift twenty pounds; frequently lift ten pounds; stand, sit, and walk for "about [six] hours in an [eight-]hour workday; and that Gulley push or pull, limited only by his ability to lift and carry. (Tr. 516.) Dr. Andrews noted no significant postural, manipulative, visual, communicative, or environmental limitations. (Tr. 516-520.) He summarized that

> [Gulley] was recently diagnosed with [sickle cell] trait . . . .[and] has 20/20 vision in his left eye. [Gulley] has [a] history of diabetes, but does not have any end organ damage. . . . [T]horacic spine findings [show] dextroscoliosis . . . . [with] [m]ild degenerative changes . . . . Claimant should be able to lift a maximum of [twenty] pounds.

> (Tr. 522.)

In response, Gulley filed a request for reconsideration of these findings. (Tr. 523.) Dr. Marion Panepinto, M.D., reviewed all of the evidence and affirmed Dr. Andrews' assessment on May 16, 2006. (Tr. 524.)

Gulley's primary physician and general practitioner, Dr. Rose Stocker, wrote a memorandum on March 25, 2006, addressed to Gulley, stating that he "will be unable to return to work." (Tr. 512.) She continued, "[The] patient has severe scoliosis and back pain. [H]e is unable to lift greater than [five] pounds without pain. [H]e . . . [is] unable to do fine detail work with his vision." (Tr. 512.)

Just a few months later, on June 5, 2006, Dr. Stocker completed a DHS Medical Evaluation form. (Tr. 544.) In it, Dr. Stocker was asked to assess Gulley's capacity for sustained physical activity by "considering the physical impairments and medically related subjective limitations" that she has diagnosed. (Tr. 546.) She listed the activities of sitting, turning, speaking, travel, fine manipulations, gross manipulations, and finger dexterity as "full capacity." (Tr. 546.) The activities of walking, standing, and climbing were evaluated as "up to twenty percent reduced capacity." (Tr. 546.) She noted Gulley's ability to stoop, push, and pull was reduced "twenty-to-fifty percent." (Tr. 546.) She did not list any capabilities as "more than fifty percent reduced," but wrote that Gully should be limited to lifting no more than ten pounds at a time. (Tr. 546.) Dr. Stocker also marked that Gulley's ability to perform "physical activities of daily living" was no more than twenty percent reduced. (Tr. 546.)

She filled out a seemingly identical form on July 5, 2006. (Tr. 541.) Only two categories had been downgraded; both "turning" and "fine manipulations" went from "full capacity" to "up to twenty percent reduced capacity." (Tr. 543.) A few categories actually showed improvement; "pushing" and "pulling" were between "twenty and fifty percent reduced capacity" but upgraded to "up to twenty percent reduced capacity." (Tr. 543.) All other categories appear to have

remained the same. (Tr. 543.) Gulley was again limited to lifting no more than ten pounds at a time and had retained the overall ability to perform physical activities of daily living with no more than a twenty percent reduced capacity. (Tr. 543.)

After almost eight months had passed, on February 16, 2007, Dr. Stocker composed a letter to "assess [Gulley's] medical issues with [specific] regards to disability," and stated the following:

- Gulley had been under her care since December of 2005,

- he frequently visited her clinic on a monthly basis,

- he had no hospitalizations in the past year,

- his back problems and scoliosis make it painful for him "to do just about anything,"

- he has scattered disk desiccation with "disc space heights [that] are fairly symmetric and preserved. . . . minimal dextrocurvature/scoliosis. . . . Facet arthrosis is noted,"

- secondary to "poorly controlled diabetes, he is blind in the right eye,"

- he has been diagnosed with ulcerative colitis and "had diarrhea and bloody stools, [but] this has resolved," and

- Gulley was taking Tramadol, Lisinopril, Famotidine, Polytrim, Metformin HCL, Asacol, Actos, Ascensia, Proctocort, Canasa, and Glyburide to treat his symptoms at the time.

(Tr. 561-568.)

Within the same letter, Dr. Stocker assessed Gulley's capacity for "sustained physical activity" and "indicate[d] the patient's capacity [to perform certain] activities during [an] [eight]-hour workday, [five] days a week." (Tr. 568.) Dr. Stocker reported that sitting, turning, speaking, traveling, fine manipulations, gross manipulations, and finger dexterity were all at "full capacity." (Tr. 568.) Walking, bending, pushing, and pulling were listed as "up to twenty percent

reduced capacity." (Tr. 568.) Lastly, the categories of standing, stopping, and climbing were labeled as "twenty-to-fifty percent reduced capacity." (Tr. 568.)

It was only three months afterwards, on May 14, 2007, when Dr. Stocker wrote a second, letter and reported that due to Gulley's back issues, he "has had [a] difficult time doing activities of daily living or any gainful employment." (Tr. 612.) "He has daily pain and this impedes doing any lifting or physical activity." (Tr. 612.) "He can't do fine work secondary to . . . visual defects." (Tr. 612.) She closed the letter, stating Gulley "has financial and emotional stressors since being ill these many years[,] and he feels fatigued[,] . . . has little energy[,] and has trouble doing activities of daily living. . . . [He] should qualify for disability." (Tr. 612-613.)

On October 17, 2007, she wrote again:

> The patient has chronic back pain, which has worsened over the last several months. . . . [He] has recently had such severe pain that he is unable to do most activities of daily living. . . . [His symptoms have] only worsened over time, such that it is unlikely that he will have much improvement in the future. He would not be able to sustain any meaningful employment as he would not be able to sit, stand, bend, climb, lift[,] . . . push[,] or pull for any reasonable amount of time required for most employment opportunities . . . . Mr. Gulley has multiple medical issues and concerns that have led to his inability to gain any measureable means of employment and he most likely will never be able to work in any job for probably the rest of his life[,] and [he] should strongly be considered a candidate for lifelong disability assistance.

(Tr. 614-615.)

After the case was remanded by the Appeals Council, non-treating orthopedic specialist, Dr. Charles J. O'Laughlin, M.D., S.C., was asked to personally examine Gulley on behalf of DDS on February 28, 2008. (Tr. 620.) Following the examination of Gulley and his records, Dr. O'Laughlin opined,

> Patient does have . . . scoliosis . . . . [but, there is] no evidence of any nerve impingement [in Guilley's spine]. . . .We [also] reviewed the X-rays and . . . MRI's of his back. There doesn't appear to [be] any severe condition of his lumbar. . . . [I]n terms of muscle [or] skeletal system[,] [patient] has very little abnormalities and while he may have some peripheral neuropathy of his feet and hands, . . . this does not appear to be severe. . . . Patient does not appear to have any [significant] orthopedic condition[,] therefore he is really not a candidate for orthopedic treatment at this time . . . .

> (Tr. 623-624.)

Dr. O'Laughlin found that Gulley could:

- sit or stand for four hours without interruption;
- walk for two hours without interruption;
- sit for eight hours total in an eight-hour workday;
- stand or walk for six hours total in an eight-hour workday;
- ambulate without a cane;
- continuously reach, handle, finger, feel, push or pull with his hands ("over 2/3" capacity);
- frequently climb stairs or ramps ("1/3 to 2/3" capacity); and
- occasionally climb ladders, balance, stoop, kneel, crouch, or crawl ("up to 1/3" capacity).

> (Tr. 626-628.)

Dr. Stocker wrote a third time on June 23, 2008: "His condition has not worsened or improved[,] and at this point[,] [it] probably will not change in the future." (Tr. 645.) She wrote a final letter, dated October 29, 2009, but since the letter was written after the ALJ's final determination, this court declines to consider that evidence. *See* 42 U.S.C. § 405(g).

## V.    Standard of Review

The court may affirm, modify or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed *de novo*. *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997).

However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner. *Schoenfeld v. Apfel,* 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a Claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.")

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C § 405(g); *see also Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion,* 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart,* 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## VI.    <u>Framework of Decision</u>

The ALJ concluded that Claimant did not meet the Act's definition "disabled," and accordingly denied his application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or

psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a Claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the Claimant is currently engaged in substantial gainful activity, (2) whether the Claimant suffers from a severe impairment, (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments, (4) whether the Claimant is capable of performing work which the Claimant performed in the past, and (5) whether any other work exists in significant numbers in the national economy which accommodates the Claimant's residual functional capacity ("RFC") and vocational factors. *See* 20 C.F.R. § 404.1520.

## VII.    Analysis

### A.    Step One: Is the Claimant Currently Engaged in Substantive Gainful Activity?

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties and is done, or intended to be done, for pay or profit. *See* 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found "not disabled" regardless of medical condition, age, education, or work experience, and the inquiry ends. If the claimant is not engaged in substantial gainful activity, the inquiry proceeds to Step Two.

The ALJ found that Gulley was "not engaged in substantial gainful activity since May 1, 2005, the alleged onset date." (Tr. 91.) The court affirms the ALJ's finding at Step One as neither party disputes it.

**B.    Step Two: Does the Claimant Suffer From a Severe Impairment?**

Step Two requires a determination whether the claimant is suffering from a severe impairment. A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. *See* 20 C.F.R. § 404.1520(c). If the claimant suffers a severe impairment, then the inquiry moves on to Step Three. If the Claimant does not suffer a severe impairment, then the claimant is found "not disabled," and the inquiry ends.

In the present case, the ALJ ruled that Gulley suffered the following severe impairments: "lower back pain/degenerative disc disease; right shoulder pain/osteoarthritis; diabetes mellitus; right[-]eye blindness, secondary to central retinal vein occlusion; colitis; and gastroesophageal reflux disease…." (Tr. 92.)

Notably, gastroesophageal reflux disease (or "GERD") is scarcely mentioned in the medical record. There is little evidence in the record that would tend to show that Gulley's GERD is disabling or that it "severely" impairs him. At most, there is a letter, written by a nurse practitioner, stating that Gulley "has GERD and takes Prevacid" in passing. (Tr. 664.) Gulley does not discuss his GERD during either hearing; nor does the ALJ or Claimant's representative question him about it. Yet, at Step Two, the ALJ finds GERD to be a severe impairment that causes "significant limitation in the claimant's ability to perform basic work activities," but then fails to mention the condition in the remainder of her opinion. (Tr. 92, 91-103.) The ALJ never

states how this disease impairs Gulley at all, much less how it causes a "significant limitation." GERD appears in the ALJ's list of severe impairments and then it disappears as though it was included in error or forgotten altogether.

Neither party takes issue with the ALJ's Step Two Finding but given this lack of evidence the court cannot rule that the inclusion of GERD in Gulley's list of severe impairments is based on substantial evidence. Upon careful review of the entire record, the court cannot discern why the ALJ included the condition at Step Two. Nonetheless, as the inclusion does not have an effect on the overall outcome of the ALJ's decision, the court will not remand on the basis of this harmless error. The ALJ supported his finding of many other significant limitations with substantial evidence. Step Two is otherwise affirmed, and the analysis moves to Step Three.

### C.      Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). The Listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from adequately performing any significant gainful activity. *See* 20 C.F.R. §§ 404.1525(a); 416.925(a). The Listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *See Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled, and the inquiry ends. If not, the inquiry moves on to Step Four.

Here, the ALJ ruled that Gulley does not have an impairment, or a combination of impairments, that meet or medically equal one of the listed impairments in 20 C.F.R. 404. (Tr. 92.) Neither party disputes this finding. As such, this Court also affirms the ALJ's Step Three determination.

### D. Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?

At Step Four, the Commissioner determines whether the claimant's residual functional capacity ("RFC") allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). The RFC assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about his limitations. *Id.* Although medical opinions bear strongly upon the determination of RFC, they are not conclusive; the determination is left to the Commissioner who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565(a); S.S.R. 82-62. If the claimant's RFC allows him to return to past relevant work, the claimant will not be found disabled; if the claimant is not able to return to past relevant work, the inquiry proceeds to Step Five.

### 1. The ALJ's RFC Finding

The ALJ found Gulley had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b),

> except he is limited to lifting/carrying [twenty] pounds occasionally and ten pounds frequently; standing/walking for a total of about six hours in an eight-hour workday; occasionally stooping, crawling, crouching, kneeling, balancing[,] and climbing ladders/ropes/scaffolds; performing jobs that do not involve detailed or fine tasks; and performing jobs that do not require good bilateral visual acuity.
>
> (Tr. 92.)

Gulley protests that the ALJ erroneously dismissed the opinions of treating physician, Dr. Stocker, and improperly relied exclusively on only the findings of Dr. O'Laughlin and the ALJ's own lay opinion. More specifically, he states that the ALJ "merely dismissed [Dr. Stocker's opinion] as inconsistent with the new[,] one-time evaluation that did not consider the combination of impairments or longitudinal record." (Pl.'s Mem. Supp. Summ. J. 11.) In short, Gulley argues that the ALJ did not provide good reasons to set aside Dr. Stocker's opinion.

S.S.R. 96-2p states that "[c]ontrolling weight may be given only in appropriate circumstances to medical opinions . . . on the [issues] of the nature and severity of an individual's [impairments] from treating sources." S.S.R. 96-2p ¶ 2. "Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "[e]ven if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is 'not inconsistent' with the other substantial evidence in the case record." *Id.* at ¶ 3-4.

Furthermore, 20 C.F.R. 404.1527(d) is clear that the ALJ must review all of the medical findings and other evidence that might support a medical source's statement that a claimant is

disabled, but "[a] statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the ALJ] will determine that you are disabled." 20 C.F.R. 404.1527(d)(2). Indeed,

> [t]he treating physician's opinion is important because that doctor has been able to observe the claimant over an extended period of time, but it may also be unreliable if the doctor is sympathetic with the patient and thus 'too quickly find[s] disability.' . . . Accordingly, if the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it.

> *Ketelboeter v. Astrue,* 550 F.3d 620, 625 (C.A.7 (WIS), 2008). (citations omitted.)

Here, as instructed by the Appeals Council, the ALJ gave great consideration to Dr. Stocker's opinion alongside two non-treating sources' opinions and explained the weight assigned to each. (Tr. 89, 92-101.) The ALJ made it clear that she determined the treating physician's opinion that Gulley was disabled was inconsistent with the substantial evidence in the record, as required by 20 C.F.R. 404.1527(d)(2): "Dr. Stocker has opined on several occasions that the claimant cannot work[,] however this is highly inconsistent with the opinions expressed by the consulting orthopedic specialist;" (Tr. 100) "her reports appear to contain inconsistencies, and she has provided limitations that are not well-supported by either her own treatment records or the other substantial evidence of record;" and "her own treatment records show relatively few significant clinical and laboratory abnormalities one would expect if the claimant were, in fact, disabled. . . ." (Tr. 101.)  The ALJ writes for almost ten pages, accurately detailing the medical record and highlights theses inconsistencies, with a particular focus on the evident discrepancies between Dr. Stocker's assessment letters and her RFC forms written between 2006 and 2007. (Tr. 92-101.) She also discusses the contrary findings of Dr. O'Laughlin

and the DDS physician, Dr. Andrews, in detail. (Tr. 96-98, 101.) The court declines to reproduce much of that specific reasoning here, but finds that the ALJ's decision to reject Dr. Stocker's opinion that Gulley is disabled is supported by substantial evidence and is affirmed. Importantly, the court also finds that the ALJ adequately considered the length, frequency, and nature of the treatment relationship between Gulley and Dr. Stocker; as well as all relevant physicians' specializations; and the consistency and supportability of their diagnoses; as required by 20 C.F.R. 404.1527(d)(2). (Tr. 96-97, 100.)

Gulley also argues that the ALJ's RFC is improper as she failed to reconcile her original "sedentary work" RFC in her 2007 determination and the current "light work" finding in 2008, "essentially finding that Plaintiff's condition is improving when updated medical evidence establishes to the contrary." (Pl.'s Mem. Supp. Summ. J. 11.) The court rejects this argument for two reasons: (1) the Claimant gives no legal support that would indicate that the failure to reconcile the two separate determinations is improper; and (2) as far as arguing what the evidence does and does not establish, the court must reiterate that it is not its obligation to challenge or delve into the ALJ's weighing of the evidence. *See Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997).

Claimant asserts that the ALJ has failed to consider all of Claimant's impairments in combination, as required by S.R.R. 96-8p and 20 C.F.R. 404.1523, and incorporate them into the hypotheticals posed to the VE. Indeed, the regulations promise that the ALJ "will consider the combined effect of all of [one's] impairments." 20 C.F.R. 404.1523. Although ALJs must not narrowly confine their reviews to isolated impairments when the record establishes some "combined effect," here the ALJ considered the combined effect of Gulley's impairments and ensured that the VE took into account all of Gulley's impairments when determining whether

jobs existed. *See Sims v. Barnhart*, 309 F.3d 424, 4432 (7th Cir. 2002.), (Tr. 23-25.) Furthermore, there is inadequate evidence within the record to establish a combined effect of impairments for the ALJ to consider.

Next, Gulley argues that the case should be remanded because the ALJ "inexplicably did not obtain a [medical expert] as . . . instructed by the Appeals Council." *Id.* This argument misinterprets the Appeals Council's order. The Order is clear: "*if necessary*, obtain evidence from a medical expert to clarify the nature and severity of the claimant's impairments. . . ." (Tr. 84.) (emphasis added.) According to that order, it was entirely within the ALJ's discretion as to whether a medical expert was needed. The court will not disturb that decision.

For the reasons stated above, the court finds that the ALJ sufficiently built a logical bridge linking the evidence of record to her RFC determination, and that her RFC is supported by substantial evidence.

## 2. The ALJ's Credibility Finding

When assessing the credibility of a claimant's statements about his or her symptoms, including pain, the ALJ should consider the following in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms;

and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  S.S.R. 96-7p; *see* 20 C.F.R. § 404.1529(c).

Using the common boilerplate language, the ALJ found that Gulley's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent [that] they are inconsistent with the [RFC] assessment. . . ." (Tr. 100.) Gulley asserts that the ALJ's credibility decision is improper as she equated caring for his daughter to the ability to perform hard work. The court presumes that the claimant refers to the following passage: "he is the sole custodian of, and apparently able to care for[,] a young child at home, which can be quite demanding both physically and emotionally, without any particular assistance." (Tr. 100.)

The Seventh Circuit has challenged such reasoning. *See Gentle v. Barnhart,* 430 F.3d 865, 867–68 (7th Cir.2005). In *Gentle,* the Seventh Circuit reiterated that "taking care of an infant, although demanding, has a degree of flexibility that work in the workplace does not." *Id.* at 867. The Seventh Circuit has warned ALJs that the failure to recognize the differences between activities of daily living and activities in a full-time job "is a recurrent, and deplorable feature of opinions by [ALJs] in social security disability cases." *Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir.2012).

Even so, the childcare issue was but one of many factors that the ALJ considers. The ALJ bases her credibility finding on other evidence as well, such as: Gulley's rather conservative treatment history, his medication prescriptions, the lack of support in the record of disability, and the fact that Gulley stopped working due to a layoff in 2005. (Tr. 100.)  The ALJ's credibility

analysis is not perfect, but it is not "patently wrong." *See Simila v.* Astrue, 573 F.3d 503, 517 (7th Cir. 2009).

The ALJ effectively considered both Gulley's subjective complaints and evidence undermining the credibility of those complaints and based her determination on multiple factors and the entire case record, as required by S.S.R. 96-7p and 20 C.F.R. § 404.1529(c). (Tr. 100.) This court finds that the ALJ's credibility determination is supported by substantial evidence and is affirmed. However, the court must emphasize with a great deal of significance that the equation to childcare and the ability to work full-time appears to be a common error in SAA cases.

### 3. Past Relevant Work

Lastly, the ALJ noted that Gulley had past relevant work as a film technician and a janitor. (Tr. 101-102.) At the second hearing, the VE testified that the film technician position required semi-skilled and light-to-medium work activity, and the janitorial position was unskilled but required medium work activity. (Tr. 101.) Adopting the VE's opinion, the ALJ found that Gulley could not perform past relevant work. (Tr. 102.) Neither party disputes this finding. As such, this court will not disturb it.

### E. Step Five: Is Claimant is capable of performing work existing in substantial numbers in the national economy?

At Step Five, the Commissioner must establish that Claimant's RFC allows Claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon the VE's testimony, or by showing that Claimant's RFC, age, education, and work experience coincide exactly with a rule

in the Medical-Vocational Guidelines (the "Grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the Commissioner establishes that sufficient work exists in the national economy that Claimant is qualified and able to perform, then Claimant will be found "not disabled." If no such work exists, Claimant will be found to be disabled.

Gulley argues that the ALJ's Step-Five finding is erroneous because the ALJ failed to include the severe impairments of colitis and gastroesophageal reflux disease (or "GERD") into the hypothetical that she posed to the VE. Gulley points to numerous cases to support his position. Of course, it is well-established within the Seventh Circuit that "[h]ypothetical questions posed to vocational experts ordinarily must include *all* limitations supported by medical evidence in the record." *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002) (emphasis in original); *See also, Cass v. Shalala*, 8 F.3d 552, 555–56 (7th Cir.1993). "The reason for the rule is to ensure that the [VE] does not refer to jobs that the applicant cannot work because the expert did not know the full range of the applicant's limitations." *Steele*, 290 F.3d at 942. However, Gulley fails to account for the exception to that rule that "exists for cases in which the vocational expert independently learned of the limitations (through other questioning at the hearing or outside review of the medical records, for example) and presumably accounted for them." *Id.*

Here, the court has already held that the inclusion of GERD into the list of severe impairments was in error at Step Two. There is no substantial evidence to support the finding that GERD was a severe impairment. However, as to colitis, Gulley testified at the hearing as to how the effects of colitis impair his ability to work: "I get [diarrhea.] [A]t least once or twice a week I have it . . . severely, [and] [i]t seems like something I might eat really aggravates [his

symptoms] a lot." (Tr. 16.) That was the extent of the conversation concerning any of Gulley's digestive symptoms (GERD, colitis, or otherwise). Soon afterwards, the ALJ asked the VE if he had "been present throughout the course of the hearing and heard all [of] the testimony." (Tr. 23.) Therefore, court presumes that the VE accounted for the claimant's testimony and factored these limitations into his answers to the ALJ's hypothetical. The *Steele* exception applies here.

Finally, Gulley claims that the ALJ failed to ensure that the VE's testimony did not conflict with the DOT. While this may be true and inconsistencies were present, Gulley's representative did not identify any conflicts during the hearing. Any conflicts that existed between the DOT and the jobs identified by the VE could not have been not apparent at the time. The VE testified that there were no conflicts and the ALJ properly relied on that testimony. *See Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008.), (Tr. 26.) Therefore, the ALJ's finding at Step Five is affirmed.

VIII.    Conclusion

As such, the court finds that the ALJ's decision is supported by substantial evidence. Claimant's Motion for Summary Judgment is denied and Defendant's Motion for Summary Judgment is granted.

ENTER:

P. Michael Mahoney, Magistrate Judge
United States District Court

**DATE:** June 21, 2013